**Richmond.**

WASHINGTON SOUTHERN RAILWAY CO. *v.* LACEY.

March 25, 1897.

1. EVIDENCE—*Introduction of—Exception must be specific.*—Where evidence is offered, a portion of which is objectionable, and the other not, and the objection is general, it must be overruled. And so of two or more ordinances, one of which is objectionable. The objection must point out specifically the objectionable features.

2. RAILROADS—*Speed—City ordinance—Reasonable ordinance.*—A city ordinance prohibiting locomotive steam engines from running through the city at a greater rate of speed than five miles an hour, and requiring a bell of not less than thirty pounds weight to be placed on each engine, and rung during the entire time the engine is in motion within the city limits, is not an unreasonable exercise of the police power of the city for the protection of its citizens, and the general public.

3. INSTRUCTIONS—*Construction of written instrument by the court.*—As a general rule the construction of all written documents given in evidence belongs to the court exclusively, and it is not error to instruct a jury as to the proper construction of a city ordinance offered in evidence.

4. INSTRUCTIONS—*Act of court—Must be construed as a whole—Harmless error.* Instructions, when given, whether asked for by one or both parties, become the instructions of the court, and should be read as a whole. Defects in one instruction may be cured by a correct statement of the law in another, if when read together the court can see that the jury could not have been misled by the defective instruction.

5. CONTRIBUTORY NEGLIGENCE—*How shown.*—Contributory negligence may be made to appear from the evidence of the plaintiff alone, or the defendant alone, or both.

6. INSTRUCTIONS—*Evidence tending to support instruction.*—If there be any evidence tending to prove the facts upon which an instruction is asked, and it correctly states the law applicable to such facts, the instruction should be given.

7. RAILROADS—*Negligence—Contributory negligence of plaintiff.*—In the case at bar the jury was justified in finding that the injury was inflicted on the plaintiff in consequence of the negligence of the servants of the railroad

company in running its trains, and the company is liable for the damages resulting from such injury, unless the plaintiff was guilty of contributory negligence; and it is still liable, notwithstanding such contributory negligence, if the exercise of reasonable care upon its part would have prevented the injury after it discovered, or ought to have discovered, his danger.

8. RAILROADS—*Crossings*—*Duty of traveller.*—It is the duty of a traveller about to cross a railroad track to use his eyes and ears to avoid danger. The track itself is a proclamation of danger. He should look in both directions from which a train could come, and listen, and, if his faculties warn him of the near approach of a train, he should keep off the track. It is not sufficient to look and listen at a great distance from the point of crossing, or under such circumstances that he will be unable to stop if warned of an approaching train. He must exercise·care to make the act of looking and listening effective. The care must be in proportion to the known danger. If he fails to use these necessary precautions and injury ensues, he cannot recover, unless the defendant company, by the exercise of ordinary care and diligence, might have prevented the injury after it discovered, or ought to have discovered, his peril.

Error to a judgment of the Circuit Court of the city of Alexandria, rendered March 23, 1895, in an action of trespass on the case wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

This is an action to recover damages of the defendant for a personal injury inflicted on the plaintiff at a street crossing, and also to recover the value of a horse and buggy. The plaintiff was seriously injured, his horse killed, and his buggy broken to pieces. The evidence sufficiently appears in the opinion of the court. The instructions, also, so far as objected to, are sufficiently set forth in the opinion except the plaintiff's instruction No. 6, on the subject of the elements of damage to be considered by the jury, if they believed the plaintiff was entitled to recover. That instruction was as follows:

"The jury are instructed by the court that, if they believe from the evidence that the defendant company is liable in this action under any of the instructions, to the plaintiff, in dam-

ages, then in estimating said damages they should take into account the bodily injury, if any, sustained by the plaintiff, the pain undergone, the effects on the health of the sufferer, according to its degree, and its probable duration as being temporary or permanent, and the pecuniary loss sustained by the plaintiff through inability to attend to his business affairs, and the value of the property of the plaintiff destroyed at the time of the collision by the defendant."

*Francis L. Smith*, for the plaintiff in error.

*Edmund Burke*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

William H. Lacey brought an action against the Washington Southern Railway Co. to recover damages for injuries done to his person and property by the alleged wrongful and negligent conduct of the railway company at a street crossing in the city of Alexandria. Upon the trial of the cause the verdict of the jury and the judgment of the court thereon were for the plaintiff, and to that judgment this writ of error was awarded.

The first assignment of error is to the action of the Circuit Court in admitting in evidence two ordinances of the city of Alexandria, and in refusing to give the nineteenth instruction asked by the defendant.

One of the ordinances referred to provides, among other things, that it shall not be lawful for an engine or car to be run in the city at a greater rate of speed than five miles per hour; and that every locomotive run in the city shall be furnished with a bell of not less than thirty pounds weight, which should be rung during the entire time the locomotive is in motion within the limits of the city.

The other was an ordinance authorizing the Alexandria & Fredericksburg Railway Co. (to whose rights it is averred the

Washington Southern Railway Co. succeeded) to lay its tracks along Fayette street, from Hoff's Run to the northern limits, of the city, and providing that the railway company should be subject to such provisions as apply to other railroads which have been permitted to occupy streets in the corporate limits, and that the locomotive steam engines used by the company should not run at a greater rate of speed than five miles an hour within the corporate limits; that a bell of not less than thirty pounds in weight should be attached to each locomotive, and be rung during the whole time such locomotive shall be in motion within the city limits.

These ordinances were offered in evidence as a whole. The objection to them was general, and not to each separately. There can be no doubt that the general ordinance, providing how all railroad companies should run their locomotives through the city was admissible in evidence. This being so, the court properly overruled the objection, even if the special ordinances as to the Alexandria & Fredericksburg Railway Co (as to which we express no opinion), were inadmissible upon proper objection. Where evidence is offered, a portion of which is admissible and a portion not, and the objection is general, the objection must be overruled. *Harriman* v. *Brown*, 8 Leigh 697; *Friend* v. *Wilkinson, &c.*, 9 Gratt. 31; *Parsons* v. *Harper*, 16 Gratt. 64; *Trogdon's Case*, 31 Gratt. 863, 881.

The defendant company's instruction No. 19, which the Circuit Court refused to give, is as follows: "'If the jury believe from the evidence that the portion of the city of Alexandria lying west of Patrick street and north of Pendleton street consists of fields, unimproved by houses and buildings, and used for the purposes of cultivation, grazing, etc., and that streets have not been opened in said portion of the said city of Alexandria, and if they believe that defendant's line of railway traverses said portion of the city of Alexandria lying west of Patrick and north of Pendleton streets, and if

they shall also believe from the evidence that Fayette stieet is open from Oronoco street to Pendleton street, a distance of one square, yet if they believe from the evidence that on the east side of said railway from Oronoco street to the city limits on the north, there are only two houses, the one known as Colross or Mason's wall, and one other, and that on the west side of said railway between said points there are no houses, and the intervening land consists of open commons and fields used for agricultural purposes, then they are instructed that the ordinance offered in evidence by the plaintiff, limiting the speed of railway trains in said territory is unreasonable and void, and inoperative in said territory."

The point at which the plaintiff was injured was not in the agricultural portion of the city limits mentioned in the instruction, but at a street crossing proper, within some three blocks of the defendant company's depot in the city. Whether the ordinance of the city regulating the speed of railway trains was unreasonable, so far as it applied to that territory it is unnecessary to decide. So far as it applied to the crossing where the plaintiff was injured, we can not say that it was an unreasonable exercise of the police power of the city for the protection and safety of its own citizens and the public generally, even if the jury had believed that all the hypothetical statements set out in the instruction were true. Before such an ordinance could be held unreasonable, and therefore void, a very strong case would have to be made. It was not done in this case, and the Circuit Court did not err in refusing to give the instruction.

The next assignment of error is to the action of the court in giving certain instructions asked for by the plaintiff.

Instructions numbered one and two were as follows:

"First. The court instructs the jury that the city council of Alexandria had full power and authority to enact and adopt the ordinances mentioned and set forth in the third and

fourth counts of the plaintiff's declaration, and which have
been read in evidence to the jury.

"Second. The court further instructs the jury that the or-
dinances of the city of Alexandria require that no engine
shall be drawn or propelled by the defendant company over
its railway tracks on Fayette street, within the corporation
limits of the city of Alexandria, at a rate of speed exceeding
five miles per hour, and that a bell not less than thirty pounds
in weight be attached to each locomotive, and be rung during
the whole time such locomotive shall be in motion within the
said limits.   And if the jury believe from the evidence that
the plaintiff was injured, and that such injury was the result
of a failure on the part of the defendant company, or its
agents, and servants, to comply with any one or more of said
requirements of said ordinances mentioned in the declaration,
they must find for the plaintiff, unless the jury further believe
that the plaintiff's injury was caused by his own fault in fail-
ing to use the precaution of a person of ordinary prudence and
care in looking out for and listening for approaching trains."

The objections taken to these instructions are that the ordi-
nance referred to in the first is unreasonable with reference to
the locality where the accident occurred, and was therefore
void, and that the second is subject to the same objection, and
to the further objection that it declares "in terms what the
ordinance was, instead of leaving that instrument to the jury,
who were the proper judges of its provisions as matter of
evidence."

The question of whether the ordinance was reasonable or
not has already been disposed of in passing on the defendant's
instruction numbered 19.

The other objection, that the jury, and not the court,
should have construed the city ordinance, is without merit.
As a general rule, the construction of all written documents
in evidence belongs to the court exclusively, and there was
nothing in this case to take it out of the general rule.   1 Tay-

lor on Ev., sec. 43, &c.; *Union Central Life Ins. Co.* v. *Pollard, ante* p. 146; *Johnson's ex.* v. *Jenning's adm'r,* 10 Gratt. 2, 11; 4 Minor's Inst. (3d ed.), p. 1086.

Instruction No. 3 was that "the jury are further instructed by the court that the plaintiff had the lawful right to cross Fayette street at any part thereof."

This instruction defendant's counsel admits "is true as an abstract statement of law, but he insists that when "employed as an instruction it should not have been separated from the companion truth, that the railroad company also had a right to use Fayette street, and if traveller and train met upon the highway, the train was entitled to precedence." Conceding that the instruction might have been misleading, if there had been no other instruction given upon that point, the defect in it was cured by instruction No. 10, given for the defendant. By the latter instruction the jury were told "that, at the crossing of a railroad and highway, the rights and obligations of the railroad company and travellers on the highway are reciprocal, but it is the privilege of the company that its trains shall have the right of way, and that all persons on the highway shall yield precedence to the trains."

Instructions when given, whether asked for by one or both parties, become the instructions of the court, and must be construed as a whole. The defects in one instruction may be cured by a correct statement of the law in another, if when the two are read and considered together the court can see that the jury could not have been mislead by the defective instruction. *Gray's Case,* 92 Va. 772, 776.

Instruction No. 4 was as follows: "The court instructs the jury that, if the defendant company relies upon contributory negligence of the plaintiff as a defence to this action, the burden of proof is upon the defendant company to establish such contributory negligence of the plaintiff by a preponderance of testimony."

The objection made to this instruction is that it is "faulty,

because the jury were told that it was incumbent upon the *defendant company to establish* the plaintiff's contributory negligence by a preponderance of testimony. This case illustrates the fact that the plaintiff's contributory negligence may appear from his own evidence and that of his witnesses, and under such circumstances it was error to inform the jury that the burden of proof was upon the defendant.''

When instruction No. 4 is read in connection with the defendant's instructions, especially No. 16, no prejudice could have resulted to the defendant from the defect complained of. The jury were told in instructions Nos. 3, 5, 6, 7, 8, 9, 12, 13, 14, and 15, what was the duty of the plaintiff in crossing defendant's track, and what acts of negligence on his part would deprive him of the right to recover, and in instruction No. 16 they were instructed that if they believed from *"the evidence"* (not merely the defendant's evidence, but from all the evidence in the cause), "that the plaintiff himself so far contributed to the accident by his own negligence, or want of ordinary care and caution, that but for such negligence or want of ordinary care and caution on his part, the accident would not have happened, the plaintiff cannot recover, and they must find for the defendant.''

The plaintiff's instruction No. 5, is as follows: "The jury are instructed by the court that if they believe from the evidence that the plaintiff, before reaching Fayette street, and the line of the defendant's railroad track, took such precautions with respect to danger of collision with trains approaching from the north on said track, as a man of ordinary prudence and care would have done, under the circumstances, to avoid injury, then the jury may find that the plaintiff was not guilty of contributory negligence.''

The objection to this instruction is that there was no evidence to support it. This objection is based upon a misapprehension of what the evidence in the case tended to prove. Both the plaintiff and Mockabee, who was in the buggy with

him, testified that when they crossed Henry street (a distance
of from 246 to 312 feet from the point of collision), they
stopped .and looked to see whether a train was approaching;
that they saw none; that about twenty feet after they crossed
that street the view north was almost, if not entirely, cut off
by reason of houses, a wall, trees and shrubbery until within
about twenty-one feet of the railroad track where the injury
occurred; that when that point was reached, Mockabee, who
was looking north, saw the train coming, but not until the
horse had his feet on the east rail of the track when he caught
the lines, or one of them, from the plaintiff, and jerked the
horse to one side, and from the track, but too late to prevent
the injury complained of.

Under our practice, if there be any evidence tending to
prove the facts upon which an instruction is based, and it
correctly states the law applicable to such a state of facts, the
instruction should be given. *Hopkins* v. *Richardson*, 9 Gratt.
485, 496; *Farrish, &c.* v. *Riegle*, 11 Gratt. 697, 719; *Early*
v. *Garland*, 13 Gratt. 2, 14; *N. Y. R. R. Co.* v. *Thomas*,
92 Va. 606; *Michie* v. *Cochran*, 93 Va. 641; 4 Minor's Inst.
(3d ed.), p. 1086.

Instruction No. 6, which told the jury what elements of
damage they might consider in making up the amount of their
verdict, if they ascertained that the plaintiff was entitled to
recover, was not to the prejudice of the defendant, and its
objection to it was properly overruled.

The action of the court in refusing to set aside the verdict
of the jury, and to grant a new trial, is assigned as error.

The jury were warranted in finding that the defendant com-
pany was guilty of negligence in the management of its train.
According to the plaintiff's evidence the train was running at
a rate of speed from four to six times as great as it had the
right to run under the ordinance of the city; and no signal
of its approach was given either by blowing the whistle of
the engine, or by ringing the bell.    The defendant was there-

fore liable for the damages done by the collision, unless the plaintiff was guilty of contributory negligence, and even if he were guilty of contributory negligence it would still be liable if the exercise of reasonable care upon its part would have prevented the injury after it discovered, or ought to have discovered, his danger. The evidence shows, however, that the defendant company could not have avoided the injury after the peril was or ought to have been discovered.

The only question which remains, therefore, to be considered is whether the plaintiff was guilty of contributory negligence.

The evidence of the plaintiff shows that he neither looked nor listened for trains coming from the north after he crossed Henry street—a square away from the Fayette street crossing where the accident occurred. It appears that the plaintiff stopped his buggy on the east side of Henry street, before he crossed the railroad track on that street, and looked out for trains from the north. At that point trains can be seen coming from the north as far as St. Asaph Junction, a distance of about 3,600 feet, or perhaps a little further. Some 250 feet south of that junction the double tracks of the railroad diverge, one running so as to pass over Henry street, and the other over Fayette street, which are parallel to each other running north and south, and one square apart. The square between these streets, and immediately north of Oronoco street, is about 246 feet east and west, and 312 feet north and south, and the streets are 66 feet wide. The evidence does not show how far south of St. Asaph Junction a train can be seen on the Fayette street track from Henry street crossing. When cross-examined upon this point, the plaintiff testified as follows:

"Q. I want to know if you undertook to tell us in your direct examination that when you were at the corner of Henry and Oronoco streets you could see a train coming over the Fayette street track from Washington?

"A. I could see a train coming from St. Asaph Junction to Alexandria on the Fayette track when I was at Henry, before crossing the street.

"Q. That is at the corner of Oronoco and Henry streets?

"A. I could, no doubt.

"Q. You are certain, now, in that statement?

"A. I do not say that I could have seen it after it came within the obstruction of this wall, but looking direct down Henry street towards St. Asaph Junction, if there had been a train, I think I could have seen it.

"Q. I am not asking you what you think.

"A. That is the best of my opinion.

"Q. I am asking you if you did not state in your direct examination that fact, that when you were at the corner of Henry and Oronoco streets, you looked to the north, and that when you were in that position you could see a train on the Fayette street track, coming from St. Asaph Junction; did you not say that?

"A. I did say that if there had been a train on Fayette street coming on that track I could have seen it at the junction from where I was.

"Q. Where could you have seen it on the track? Where would the train have been on the track?

"A. I do not know exactly where I could have seen it on the track. I could have seen it in the distance. There is an open space there, and any man who can see at all could see the train."

Mockabee upon this point on cross-examination says:

"Q. And from there you drove up to the corner of Henry and Oronoco street?

"A. Yes, sir.

"Q. There you stopped to take an observation, to see if a train was coming over the Fayette street track?

"A. Yes, sir; not only over the Fayette street track, but the Henry street track also.

"Q. Will you tell the jury whether a person either standing or in a vehicle at the corner of Oronoco and Henry streets can see a train on the Fayette street track within three hundred yards north of Oronoco street?

"A. I am unable to answer whether you could see an engine on the Fayette street track.

"Q. You did not stop at that point, then, to observe a train on Fayette street track?

"A. We stopped at that point to observe up Henry street the railway both ways.

"Q. I am not talking about Henry street; I am talking about Fayette street. You say you stopped at the corner of Oronoco and Henry streets, and you say you do not know whether you could have observed a train over on the Fayette street track.

"A. I cannot say to my knowledge whether I could see a train on the Fayette street track.

"Q. Then you did not stop there to ascertain that fact?

"A. We stopped to look for all trains.

"Q. Although you cannot say that from that point you can see a train on the Fayette street track?

"A. I never did.

"Q. I asked you if you can, as a matter of fact?

"A. I am answering you as near as I know.

"Q. How often had you visited the scene of the accident?

"A. I suppose I have gone down there a dozen times.

"Q. How often have you passed over the railway track before the accident happened?

"A. I suppose fifty times.

"Q. Then you knew on that day not only that there was a track in Henry street, but also that there was a track on Fayette street, on the other side of Mason's wall?

"A. Most assuredly.

"Q. You passed over that fifty times?

"A. At least fifty times.

"Q. Did you know on that day that it was a dangerous crossing at Fayette and Oronoco streets?

"A. Yes, sir."

The plaintiff's evidence discloses the fact that either he did not look carefully for trains on the Fayette street track, or that his view was so obstructed that he could not see trains upon that track for several hundred yards north of the point where it crossed Oronoco street. His witness, Enders, who was standing at the corner of Oronoco and Fayette streets, and saw both the buggy and the train as they approached the point of collision, proved that when he first saw the train it was about the curve back of Mason's wall, a distance of about 500 or 600 yards, and that the buggy at that time was "about one quarter of the way coming from Henry street towards Fayette street. The distance from Henry to Fayette street is 246 feet. After crossing Henry street the plaintiff had travelled about one-fourth of 246 feet, say from 60 to 100 feet, when the train was first seen by witness Enders at a point from 1,800 to 2,100 feet south of St. Asaph Junction. The plaintiff was travelling, according to his own statement, in a slow trot, three or four miles an hour. For the train to have run 1,800 to 2,100 feet during the time he was travelling 60 to 100 feet would have required a rate of speed of from 70 to 100 miles an hour. There is no pretence that the train was running at any such rate of speed, and it is contrary to the evidence of both parties. It is apparent, therefore, that the plaintiff either did not or could not, at the Henry street crossing, make such a lookout for trains coming from the north over the Fayette street track as would justify him in attempting to cross that track without further looking and listening for approaching trains.

But it is said that the view north is so obstructed by the buildings, walls, fences, trees and shrubs on Mason's square, which extends from Henry street to Fayette street, that nothing would be gained by looking. Even if this were true, it

does not excuse the plaintiff from the duty of listening for approaching trains before going upon the track.

But the plaintiff's own testimony shows that by the exercise of ordinary care and caution he could have seen the train by which he was injured before he reached Fayette street, and whilst there was ample time to have avoided the danger. The obstructions upon Mason's square (now owned by Smoot), were described by the plaintiff as follows: "First there is a wall, then a two story building, then there is a two story back building at the centre, and further on towards Fayette street there is another two story portion. There is a one story building there, and then a stable—a two story stable. It is surrounded by shrubbery, and good large trees there. The height of them I never measured. I know they were in foliage, being in the month of October." Upon cross-examination, when asked about these obstructions, he testified as follows: "Q. Now I want to know—you say you have been out there since—how far do these buildings of Mr. Smoot set back from the line of the street?

"A. I cannot exactly tell you the number of feet that those houses set back.

"Q. They set back some distance?

"A. Yes, sir, some distance; as far as from here to the wall (indicating).

"Q. What is the character of the fence in front on Oronoco street, and the fence on Fayette street?

"A. There is a paling fence around the house.

"Q. Did you measure the fence to see how high it was?

"A. No, sir; I did not measure it to see how high or how long it was.

"Q. It is an open fence?

"A. Yes, sir.

"Q. About four feet high?

"A. I should judge it was four to four and a half feet high.

"Q. What is the distance of the stable from Oronoco street?

"A. I do not know exactly.

"Q. We will call this (indicating with a book), the line of those buildings, the south front of Mr. Smoot's building, and this (indicating), is the space from the south line of the brick stable out to Oronoco street. Will you tell me whether a person going in a vehicle along Oronoco street here cannot look across that angle over that fence and see an engine and train of cars coming from the north?

"A. Probably some people might look over there and see it, but if there was anything there to obstruct the view—

"Q. I am speaking of it as it is now, and as it was then. I am speaking of it as it was then with the fence there. I asked you whether a person, either riding or walking along Oronoco street, could not look over that fence and across that angle and see an engine at any point from the south wall of that stable down to the centre of Oronoco street?

"A. I could not exactly answer that question that they could see it, but they could see the engine, if they were looking in that direction. But, if a person had an idea that there was not any approaching train, he would not look that way.

"Q. That is what you did not do; you did not look that way.

"A. I did not look that way. I did not go up the track to see if there was a train coming.

"Q. You looked to the south?

"A. No, sir; I was looking directly in front of me, driving.

"Q. You were looking directly in front of you?

"A. To the west.

"Q. You did not look to the right?

"A. The only way I could look was west and south in order to see an approaching train.

"Q. Is it not a dirt road out there?

"A. I believe it is."

Again: "Q. Will you tell me why, when you passed Mr. Smoot's paling fence, you did not look to your right and see whether a train was coming from Washington?

"A. Because I thought I had used all proper precaution. I had looked.    I had stopped to look.

"Q. Where?

"A. At Henry and Oronoco streets.    I then proceeded, thinking that there was not any train approaching, and the only possible way there could be any train was coming north.

"Q. A train from the south going north?

"A. Yes; if there had been a train I think I could have seen it."

It is clear from the plaintiff's own testimony that his failure to look and listen for trains at the crossing was not because he could not do so by ·reason of the obstructions upon the Mason square, but because he thought, from the observations made by him at the Henry street crossing, that no train was approaching from that direction, and there was, therefore, no necessity for looking and listening.    His companion, Mockabee, was looking north when he saw the train approaching, but the buggy and horses feet were then on or so close to the east rail of the track that, going at the speed they were, it was too late to avoid the injury.    Such looking is not that contemplated by law.    The mere fact of looking and listening is not always a performance of the duty incumbent upon the traveller, for he must also exercise care to make the act of looking and listening reasonably effective.    He must not approach the track at such a rate of speed that when he reaches a point where he can see or hear the train it is too late to protect himself from injury.    He must exercise ordinary care in attempting to cross or in crossing the track, and care is never ordinary care unless it is proportionate to the known danger.    3 Elliot on Railroads, secs. 1164, 1165, 1166; 2 Shearman and Redfield on Negligence, secs. 476, 478.

The track itself is a proclamation of danger.    It is his duty

before going upon it to use his eyes and ears.    He should look
in both directions from which a train could come, and listen,
and, if his faculties warn him of the near approach of a train,
he should keep off the track.    If he fails to use these neces-
sary precautions and injury ensues, he cannot recover, unless
the defendant company, by the exercise of ordinary care and
diligence, might have prevented the injury after it discovered,
or ought to have discovered, his peril.    *Johnson* v. *C. & O.
Rwy. Co.*, 91 Va. 171; *Seaboard & Roanoke R. Co.* v. *Joy-
ner*, 92 Va. 354.

The plaintiff was well acquainted with the crossing and its
surroundings, yet, without looking or listening, he drove
upon it and was injured, and the only excuse he gave for his
conduct was that he stopped and looked for trains at a point
246 feet from the crossing where only a partial view of the
Fayette street track could be had, or he looked so carelessly
that he did not see the train that injured him, which his own
evidence shows was necessarily at some point between St.
Asaph Junction and the Fayette street crossing at that time,
and the further excuse that the view, from the point, where
he looked and listened, to the crossing, was so obstructed that
he could not see an approaching train, when, by his own ad-
missions, he could have seen such train before he reached
Fayette street if he had looked.

This was such negligence as deprives the plaintiff of the
right of recovery.    The judgment of the Circuit Court must
therefore be reversed, the verdict set aside, and a new trial
granted.

*Reversed.*