Statement.

𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

REUSENS V. LAWSON AND ANOTHER.

SEPTEMBER 15, 1898.

1. EJECTMENT—*Burden of Proof—Description of Land.*—In an action of ejectment the burden of proof is upon the plaintiff to establish his title to the land described in his declaration, and his right to recover the possession thereof from the defendant.   Whether the plaintiff has established the beginning point of his survey as stated in the declaration, or the courses and distances of the several calls, are questions to be determined by the jury under proper instructions from the court.

2. SURVEYS—*Corners—Courses and Distances—Natural Monuments.*—Where the beginning point of a survey is in doubt, but the course and distance from that point are along one natural monument and to another, such point should be ascertained by the beginning at the natural monument mentioned as at the end of the distance and reversing the course and measuring the same distance along the other natural momument given.

3. NEW TRIALS—*Verdict without Evidence or against the Evidence.*—This court will not set aside the verdict of a jury and the judgment thereon of the trial court except where the jury has plainly decided against the evidence, or without evidence.   Although the court, if on the jury, might not have concurred in the verdict upon the evidence as written down, it will not (merely for this reason) set the verdict aside.   It will not interfere in a doubtful case.

4. INSTRUCTIONS—*Evidence to Support.*—If an instruction is asked which correctly propounds the law, and there is evidence tending to support the hypothetical case stated, of however little weight the evidence may appear to the court to be entitled, or however inadequate, in its opinion, to make out the case supposed, it should be given.

Error to a judgment of the Circuit Court of Carroll county rendered May 6, 1897, in an action of ejectment, wherein the plaintiff in error was the plaintiff, and the defendants in error were the defendants.

*Affirmed.*

The evidence sufficiently appears in the opinion of the court. The instructions referred to in the opinion of the court as numbers 5, 6, and 7 given for the defendants, and number 13 given for the plaintiff, are as follows:

### No. 5.

" The court instructs the jury that if they should believe from the evidence that the land in controversy is not within the boundaries of the Miller patent, and should further believe from the evidence that Purvis, under whom the plaintiff claims, took possession of the land in controversy, or any part thereof, as a mere squatter, without any claim or color of title, no such possession by him of such land or any part thereof can ripen into a good title, so as to enable the plaintiff to recover said land or any part thereof."

### No. 6.

" The court instructs the jury that if they believe from the evidence that the Miller grant, under which the plaintiff claims, includes within its exterior boundaries lands which were excepted from the operation of said grant, then it is incumbent on the plaintiff to show, by preponderance of evidence, that the lands of the defendants are not within the excepted lands."

### No. 7.

" The court instructs the jury that if they believe from all the evidence that the boundaries of the Miller grant are in such doubt and uncertainty that they cannot say whether or not they embrace the land in controversy, they must find for the defendants."

### No. 13.

" The jury are instructed that if they believe from the evidence that the plaintiff has shown 7,000 acres covered by prior entries, surveys or grants within the boundaries of the Lee grant, and that the 206 acres, now in controversy, is not

any part of such 7,000 acres, the plaintiff has sustained the burden which the 6th instruction given for defendants says is on the plaintiff, and if the defendants claim that the 206 acres is land which was excepted from the Lee grant, the burden is shifted on them to show it."

*Phlegar & Johnson* and *P. Bouldin, Jr.*, for the plaintiff in error.

*Samuel A. Anderson* and *D. W. Bolen*, for the defendants in error.

RIELY, J., delivered the opinion of the court.

This is an action of ejectment to recover two hundred and six acres of land, which the plaintiff asserts is a part of a large grant to General Henry Lee, assignee of John Miller, and within the survey for Miller upon which the grant was founded.

The case is before us for the second time. It was here before mainly upon matters of law. *Reusens* v. *Lawson*, 91 Va. 226. It is now before us chiefly upon questions of fact.

The defence was twofold: First, that the land was not within the Miller survey; and second, that, if covered by it, the defendants and those through whom they claim were purchasers for value, and had held adverse possession under color and claim of title beyond the statutory period of limitation.

Upon the plaintiff devolved the burden to prove by satisfactory evidence his title to the land, and to establish his right to recover possession thereof from the defendants.

One of the principal difficulties encountered by the plaintiff in making out his title was in establishing satisfactorily the beginning corner of the Miller survey. Unless this corner was established, he could not locate correctly or satisfactorily the Miller survey, and prove that the land in controversy is within its boundaries.

It is not proposed to go into a minute discussion of the evidence, but merely to advert to some of its principal features.

The original survey for Miller and the grant to Lee describe the land embraced therein as follows : " Beginning at a poplar and persimmon on the north side of Big Dan river, thence new lines N. 23 degrees E. 1280 poles to a chestnut tree, N. 40 degrees E. 500 poles to a black walnut tree, N. 40 degrees E. 1600 poles to a black walnut tree and hickory near a path, S. 45 degrees E. 1300 poles down the Mayo river to Magruder's corner white oak, thence his line N. 20 degrees W. 36 poles to a white oak, &c., &c."

The plaintiff claimed as the beginning corner of the Miller survey the point at A on Big Dan river, on the map made by Surveyor Branscome.

No witness introduced on the trial ever saw the poplar and persimmon which are described as the beginning corner, and there was no direct testimony to fix their particular location on the river. The plaintiff claimed to fix the point at A as the beginning corner by reference to the deed from Henry O. Middleton, a grantee of the larger and northern part of the Miller survey to Stephen Goings for 238 acres of the Lee grant. This deed was made in 1831, thirty-six years after the Miller survey. It describes the land conveyed to Goings as a part of the large survey of Russell (Miller), in Patrick county, on the Blue Ridge mountain, and as beginning at a large poplar on the North side of Big Dan river, " the beginning corner of the said Russell survey." The plaintiff claimed that a poplar stump at or near the point at A on the river was the poplar referred to as the beginning corner of the Russell survey. It was a "large poplar" in 1831, when the deed from Middleton to Goings was made, and stood near where the road crosses the river, but so far as the record discloses, no witness introduced ever saw the tree when standing, and there was no evidence that there was any mark on it, or on the log after the tree had fallen, or on the stump, to identify the tree as the

corner of a survey, or that it was a marked tree. The plaintiff contended that its identity was established by the ability to begin at it and run the lines of the Goings land according to the courses and distances given in the deed. This, according to the testimony, was not free from doubt.

On the other hand, there was much in the evidence to cast great doubt upon the poplar stump as the beginning corner of the Russell (Miller) survey. It is not on the north, but on the east side of the river. Surveyor Pedigo did not agree that it was the beginning corner, but commenced his survey thirty-seven poles farther down the river. The Ternan grant adjoins the Lee grant, and the McLean survey upon which the Ternan grant was issued was made by the same person (Surveyor Stovall) who made the Miller survey, and at the same time. Both surveys have the same beginning corner. The McLean survey and Ternan grant begin at John Miller's corner poplar on the north side of Big Dan river, and thence run down the river " as it meanders 640 poles to Wm. Carter's corner beach at the mouth of Buzzard branch." The branch, like the river, is a fixed natural monument. The corner trees (poplar and persimmon) at the beginning of the Miller survey not being found, and the location of the corner being in great doubt, it ought to be reached and located by running up the river as it meanders 640 poles from the mouth of Buzzard branch; but the testimony shows that a line so run would stop far short of the point at A; would not in truth go over half the distance.

If the point at A be in fact the beginning corner of the Miller survey, and the courses and distances thereof be thence run, the result should correspond with the requirements of the calls, but so far from this being the case, it appeared, on running from A the calls of that survey, that there was much in the result to negative the claim that the point at A was the beginning of that survey.

The first call is N. 23 degrees E. 1280 poles to a chestnut tree. Being run from the point at A, no corner was found

at B, the end of the call; chestnut timber was found there, but no marked chestnut tree. The next call is N. 40 degrees E. 500 poles to a black walnut tree. No walnut tree or corner was found at the end of the line. The next call is N. 40 degrees E. 1600 poles, to black walnut tree and hickory, near a path. The distance of this call, if run out, would have gone down the Blue Ridge, and on the north side of Bull mountain, and away from Mayo river and the requirement of the next call. The plaintiff did not run out the distance, but stopped at Witt's Spur path at the point at D, five hundred and sixteen poles short of the call. No evidence of any corner was found at the path at D, and though the call was for a walnut tree, none was found, and the testimony was that at D the soil is not adapted to the growth of walnut timber, and that none was ever known to grow there. The fourth call is S. 45 degrees E. 1300 poles, down Mayo river, to Magruder's corner white oak. The Magruder survey calls for several white oak corners in this vicinity, and to reach the "fallen white oak," which the plaintiff contended was the one referred to, the course and distance had to be changed. Instead of running S. 45 degrees E. 1300 poles, the line had to be run S. 35 degrees E. 1543 poles, in order to reach the "fallen white oak." Whether this white oak was the one referred to or the one farther South, marked "white oak stump" on the map, the evidence was contradictory, there being testimony before the jury that Middleton, in looking up the boundaries of the land, claimed the "white oak stump" as the Magruder white oak referred to in the Miller survey.

In addition to the discrepancies between the calls of the survey and the courses and distances which were run by Surveyor Branscome by direction of the plaintiff, there was much in the evidence to throw doubt upon his right to the parcel of land in dispute.

Starting at the point at A, which was contended for by the plaintiff as the beginning corner of the Miller survey, and

running the very first call, the line, before going half the dis-
tance of the call, crosses the mountain, and passes directly
through the tract of 235 acres of B. Magruder. The Miller
survey was made in 1795. The survey of the Magruder tract
had been made by the same surveyor only four years before,
and the patent for it duly issued. It is not reasonable that,
with the Magruder survey fresh in his memory, he would have
run *through* the Magruder land, and included an unknown and
indefinite portion of it within the Miller survey, without some
mention of the fact, or at all probable that the line would
have been so run and no reference be made in the calls to the
lines of the Magruder survey.

The Miller survey, as run by Surveyor Branscome, in accord-
ance with the contention of the plaintiff, includes much land
beyond the mountain, but it was in evidence that Middleton,
and after him, Purvis, his grantee, were both in the county in
the life-time of Surveyor Stovall, and while he was still the
county surveyor, looking up the corners and boundaries of the
land, and that neither of them ever contended that any of the
land lay north of or beyond the Blue Ridge, but, on the con-
trary, only claimed to the brow of the mountain upon its
southern side. This testimony tended to explain why, in
starting at the point A, claimed by the plaintiff as the begin-
ning corner, and running the calls of the survey, no walnut
timber was found at D as called for, and to prove the incor-
rectness of the starting point; it being shown that there is no
walnut timber on the top or on the north side of the mountain,
and that none ever grew there, but that it abounds on the
south side of the mountain.

The fourth call from the walnut tree and hickory near a path
at the end of the third line is " down the Mayo river to Ma-
gruder's corner white oak," and shows that the walnut tree
and hickory were in close proximity to the river, or, making
allowance for the loose surveys of that day, that the river was
at least in sight. The evidence, however, shows that Hylton's

spring, the head water of the Mayo river, is three hundred poles south of the point at D, claimed by the plaintiff as the end of the third line, and that the mountain lies between D and the river. Bearing this in mind, and recalling the evidence that no corner or walnut tree was found at the point at D, and that no walnut timber ever grew there, but that it did grow on the south side of the mountain, and also that Branscome had to change the course of the fourth call and protract the distance two hundred and forty-three poles in order to reach the "fallen white oak," claimed by the plaintiff as the end of the fourth line, and the inference is both reasonable and strong that the point at D is much too far north to be the corner of the Miller survey at the "black walnut tree and hickory near a path," even if Witt's Spur path, of all the old paths shown to have existed, be the one referred to.

There was no evidence that the points at A, B, C, D, and E on Branscome's map were ever claimed by Middleton or Purvis as corners, when looking up the corners and locating the boundaries of the Miller survey in the life-time of the surveyor who made it, which points, if correct, would include the parcel of land in dispute, but there was evidence before the jury tending to prove that Purvis, who at one time spent four months in endeavoring to establish the boundaries of his land, never claimed it.

The facts which have been adverted to and others that might be mentioned tended to prove that the location of the Miller survey as contended for by the plaintiff was too high up, and that it lies lower down and further south.

Without further reference to the evidence and its many discrepancies, it is sufficient to say that we have carefully gone over it all, and studied it in connection with the maps and surveys filed with the record, and are unable to say, after mature consideration, that the jury were not warranted in finding a verdict for the defendants, and that the Circuit Court erred in refusing to set aside the verdict as contrary to the evidence.

Whether the land sued for lies within the boundaries of the Miller survey, and is covered by it was, upon all the evidence, left in such doubt and uncertainty as that the jury could reasonably find that it was not. The jurors were, under the law, the judges of the weight and effect to be given to the evidence. Under our judicial system, they are the triers of the facts. The court before which the case was tried saw the witnesses, and heard them testify. It was satisfied with the verdict, or, at least, did not feel justified in disturbing it. Its sanction of the verdict gives additional weight to it. This court will not, under these circumstances, set aside the verdict of a jury, except where the jury has plainly decided against the evidence or without evidence, although the judges of this court, upon the evidence as it is presented to them in the record, if they had been on the jury, might have rendered a different verdict. We cannot, under repeated decision of this court, set aside the verdict of a jury merely in a doubtful case. We can only do so where the verdict is a plain deviation upon the evidence from right and justice, or where there is a palpable insufficiency of evidence to sustain it. This is the established practice of this court as settled by a long line of decisions. *Kimball & Fink* v. *Friend*, 95 Va. 125; *Southern R. Co.* v. *Bryant*, Id. 212; *Michie* v. *Cochran*, 93 Va. 641; *Read's Case*, 22 Gratt. 924; *Vaiden's Case*, 12 Gratt. 717; and *Brugh* v. *Shanks*, 5 Leigh 598.

It was said in *Hill's Case*, 2 Gratt. 594, and the language was approved in *Read's Case*, 22 Gratt. 944, that "where the jury and the judge who tried the cause concur in the weight and influence to be given to the evidence, it would be an abuse of the appellate powers of this court, remote as it is from the scene of the transaction, having the evidence only on paper, divested of many elements which enter into every jury trial, and which, from their nature, cannot be presented on paper, to set aside a verdict and judgment, because the judges of this court, from the evidence written down, would not have concurred in the

verdict. Although we have, contrary to the rule of the English courts, decided that it is within the appellate powers of this court to set aside a verdict because it was not authorized by the evidence; yet it is only in a case where the jury has plainly decided *against the evidence, or without evidence,* that this appellate power will be exercised."

· And a similar statement of the powers and practice of this court with respect to new trials was made by Judge Christian in *Blosser* v. *Harshbarger,* 21 Gratt. 214.

Having reached the conclusion that the verdict of the jury was warranted by the evidence, and that we are not authorized, in view of the long and well settled practice of this court, to interfere with the verdict by setting it aside and awarding a new trial, even if we were so disposed, it becomes unnecessary to consider the defence of adversary possession.

The only other matter left for determination relates to the propriety of instructions numbered 5, 6, and 7, which were given for the defendants. In this the court below committed no error.

As to instructions 5 and 7, there being evidence before the jury upon which to predicate them, it was the duty of the court to give them upon the request of the defendants. Where there is evidence tending to make out the supposed case, of however little weight the evidence may appear to the court to be entitled, or however inadequate in its opinion to make out the case supposed, it is safest and best for the court not to refuse to give an instruction asked for if it propound the law correctly. *Michie* v. *Cochran,* 93 Va. 641; *Hopkins, Brother & Co.* v. *Richardson,* 9 Gratt. 485; and *Kimball & Fink* v. *Friend,* 95 Va. 125.

· As to instruction No. 6, it is in accordance with the views of this court as laid down on the former appeal, and considered in connection with instruction No. 13, given for the plaintiff and explained by it, instruction 6 could not have possibly prejudiced the plaintiff.

Opinion.

The case was submitted to the jury with correct instructions upon the different phases of the evidence, which was in great part obscure, uncertain, and conflicting. Upon the consideration of the whole evidence, and under the instructions, a verdict was fairly rendered by the jury in favor of the defendants; the trial court approved the finding; and this court, bearing in mind the principles which control the exercise of its appellate powers in such cases, cannot disturb the verdict.

The judgment of the Circuit Court must be affirmed.*

*Affirmed.*

---

* *Note by the Reporter.*—No map of the land was furnished with the record.